**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

STEVE L. HAMBLIN, SR., :

                    Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                    Defendant. :

Case No. 3:08-cv-051

District Judge Thomas M. Rose
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g), as incorporated into 42 U.S.C. §1383(c)(3), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for supplemental security income SSI benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits

prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 . If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSI on June 16, 2003, alleging disability since January 31, 2002, due to anxiety disorder, low back injury, bad arches and ankles, bursitis at the right shoulder, carpal tunnel syndrome, and acid reflux disease. (Tr. 67-69, 90). Plaintiff's application was denied initially and on reconsideration. (Tr. 44-53). A hearing was held before Administrative Law Judge Daniel R. Shell, (Tr. 557-77), who determined that Plaintiff is not disabled. (Tr. 20-40). The Appeals Council denied Plaintiff's request for review, (Tr. 6-9), and Judge Shell's decision became the Commissioner's final decision.

3

In determining that Plaintiff is not disabled, Judge Shell found that Plaintiff has severe chronic back pain due to spinal sprain/strain and degenerative disc disease, residual effects of right shoulder injury, residual effects of bilateral carpal tunnel syndrome and corrective surgeries, and an affective disorder with depressive and anxiety features, but that he does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 39, finding 3). Judge Shell found further that Plaintiff has the residual functional capacity to perform a limited range of medium work. (*Id.*, finding 5). Judge Shell then used section 203.26 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (*Id.*, finding 10). Judge Shell concluded that Plaintiff was not disabled and therefore not entitled to benefits under the Act. (Tr. 40, finding 12).

In June, 2001, Plaintiff sought treatment from a chiropractor for back pain. (Tr. 160-86). Plaintiff received the usual chiropractic treatments until at least September 24, 2003. *Id.*

The record reflects that Plaintiff received general medical care from the primary care physicians at the Dayton Wellness Center, including Dr. Gilreath and Dr. Nwokoro, during the period July 3, 2000, through February 9, 2004, (Tr. 187-285).

On June 20, 2002, Plaintiff consulted with Dr. Ebert who noted that Plaintiff complained that both of his hands were cramping up and going numb. (Tr. 290-98). Dr. Ebert also noted Plaintiff had sensory deficits to light touch in both the right upper extremity median nerve distribution and the left upper extremity small finger and that he had moderate median nerve compression in the left upper extremity and some in the right as well. *Id.* Dr. Ebert reported that Plaintiff's Tinel's sign was positive on the left and that an EMG showed bilateral median nerve

4

compression at the wrists. *Id.* Dr. Ebert recommended that Plaintiff undergo staged bilateral carpal tunnel releases. *Id.*

On July 18, 2002, Plaintiff under went a left carpal tunnel release and excision of glass to the right proximal lateral forearm which Dr. Ebert performed. (Tr. 299-300). On August 15, 2002, Dr. Ebert noted that Plaintiff reported his severe pain and numbness in the left hand had resolved. (Tr. 295). On September 19, 2002, Plaintiff underwent a right carpal tunnel release which Dr. Ebert performed. (Tr. 301-02). Dr. Ebert reported on October 17, 2002, that Plaintiff was somewhat bothered by mild tenderness and red discoloration of the incision. (Tr. 293). On November 5, 2002, Dr. Ebert noted that Plaintiff reported that he thought that he was able to perform normal light home activities with his hands. (Tr. 293).

On April 9, 2003, treating physician, Dr. Nwokoro reported that Plaintiff's multiple diagnoses included anxiety/depression, carpal tunnel syndrome, osteoarthritis, back spasms, and gastroesophageal reflux disease. (Tr. 286-88). Dr. Nwokoro also reported that Plaintiff had a pending psychiatric evaluation and that he needed physical therapy. *Id.* Dr. Nwokoro opined that Plaintiff's could stand/walk for 3 hours in an 8-hour day and for 1 hour without interruption, sit for 4 hours in an 8-hour day, and for 2 hours without interruption. *Id.* Dr. Nwokoro also opined that Plaintiff could lift up to 10 pounds frequently and up to 20 pounds occasionally. *Id.* Dr. Nwokoro noted that he based his conclusions on physical examination, radiographic studies and reports, consultative reports, and Plaintiff's subjective complaints and that he expected that Plaintiff's limitations would last between 9 and 11 months. *Id.*

Plaintiff received treatment from Dr. Polansky on June 19, 2003, due to a workers' compensation injury to his right ankle which he sustained when he was attacked by two dogs in

5

2000. (Tr. 304, 392). Dr. Polansky noted that Plaintiff's left ankle had become markedly symptomatic and edematous and he put Plaintiff in bilateral flex-casts. (Tr. 304, 387, 392).

Plaintiff sought mental health treatment at Advanced Therapeutic Services and on October 1, 2003, he was evaluated by Mark Schweibert, a therapist, who noted that, in addition to complaints of pain, Plaintiff reported numerous anxiety attacks with feelings of panic and that his first panic attack occurred in January 2001 when he was taken from his place of work in an ambulance. (Tr. 318-20). Mr. Schweibert identified Plaintiff's diagnosis as anxiety disorder NOS. *Id.* Plaintiff was then evaluated by psychiatrist Dr. Gollamudi on October 3, 2003, who noted that Plaintiff's mood and affect were anxious. (Tr. 313-15). Dr. Gollamudi identified Plaintiff's diagnosis as adjustment disorder with mixed emotional features and he assigned Plaintiff a GAF of 55. *Id.*

On October 23, 2003, examining physician, Dr. Danopulos, reported that Plaintiff's mental status was normal and that Plaintiff complained of low back pain, right shoulder pain, right ankle pain, and anxiety attacks. (Tr. 322-30). Dr. Danopulos also reported that Plaintiff's upper and lower extremities revealed full ranges of motion, his right shoulder was painful with motion, squatting and arising from a squat triggered lumbosacral pain, and that Plaintiff walked with a normal gait without ambulatory aids. *Id.* Dr. Danopulos noted that Plaintiff got on and off the examination table without difficulty, bilateral straight leg raising tests produced normal results, and that Plaintiff performed heel walking and toe walking normally. *Id.* Lumbar x-rays performed in conjunction with Dr. Danopulos' exam were normal and x-rays of the right showed prior trauma to the distal clavicle with post traumatic myositis ossificans (degenerative changes) inferior to the mid shaft of the clavicle. *Id.* Dr. Danopulos opined that Plaintiff's ability to do any work-related activities like walking, lifting, and carrying were restricted from his chronic lumbosacral pain and

right ankle pain. *Id.*

Examining psychologist, Dr. Flexman reported on November 18, 2003, that Plaintiff completed the 10th grade, had no gait disturbances, had fidgety body movements, and that he was alert and oriented. (Tr. 333-36). Dr. Flexman also reported that Plaintiff's attention span was fair, his concentration was fair, his intellectual functioning was average, his recent and remote memory was good, and that his judgment was fair. *Id.* Dr. Flexman identified Plaintiff's diagnoses as anxiety disorder NOS and dependent personality traits and he assigned Plaintiff a GAF of 65. *Id.* Dr. Flexman opined that Plaintiff's ability to understand, remember, and carry out short, simple instructions was normal, his inability to make judgments for simple work-related decisions was slight, he had only slight difficulty with the ability to sustain attention and concentration, and that Plaintiff had moderate restrictions on his ability to relate to the public and supervisors. *Id.* Dr. Flexman further opined that Plaintiff's restriction for interacting with co-workers was only slight and that he had moderate restrictions in his ability to respond appropriately to work pressures in a normal work setting. *Id.*

A November 14, 2003, x-ray of Plaintiff's lumbar spine revealed degenerative changes with slight anterolisthesis of L5 relative to L4, the possible presence of lucence in the pars interarticularis at L5, which could represent spondylolysis, and possibly some mild degree of loss of height at the L4-L5 intervertebral disc space consistent with early degenerative disc disease. (Tr. 332).

Plaintiff injured his foot in January 2004 when he sustained a fracture which required a reduction and fixation with external frame application which podiatrist Michael Regan performed. (Tr. 397). Dr. Regan adjusted the external frame over time to improve alignment and healing and

he removed the fixator on March 26, 2004. (Tr. 393-396).

Plaintiff continued to receive mental health treatment from Dr. Gollamudi and Mr. Schweibert. (Tr. 360-66). Dr. Gollamudi' office noted dated 2004 and early 2005 generally reflect normal findings on mental status examinations. *Id.* Dr. Gollamudi reported that Plaintiff had no abnormal movements, that his mood was euthymic, and that his thought processes were goal-directed. *Id.* Plaintiff's mental health treatment notes dated March 2005 through October 2005 reflect that Plaintiff was anxious and occasionally depressed, and notes dated January through June 2006 reveal that continued to take medication. (Tr. 426-33; 524-28).

On April 26, 2004, Dr. Gollamudi noted Plaintiff was moderately to markedly impaired in most work-related mental abilities although Dr. Gollamudi also noted that Plaintiff was "not significantly limited" in his ability to understand and remember very short and simple instructions. (Tr. 373-74). Dr. Gollamudi opined that Plaintiff's anxiety problem impaired his capacity to work and that the significant pain Plaintiff experienced on a daily basis affected his concentration, performance, and memory. *Id.*

On June 16, 2004, Plaintiff consulted with Dr. Urse, an orthopedist, who reported that Plaintiff's right shoulder was tender over the AC joint line with some reduction in motion of the shoulder. (Tr. 372). Dr. Urse also reported that a right shoulder x-ray showed some soft tissue calcification in the area of the acromioclavicular joint. *Id.* Plaintiff apparently did not return for a follow-up visit to Dr. Urse. *Id.*

In about July 2004 Plaintiff began receiving treatment from Dr. Saleh and physician assistant William Booth at the Ohio Institution for Comprehension Pain Management, Inc., and he continued to receive treatment at that facility until at least July 2006. *See,* Tr. 375-82; 399-406; 434-

68; 483-523; 533-540. On August 9, 2004, Dr. Saleh reported that Plaintiff's health status was "poor but stable", he could only stand/walk and sit each for 2 to 3 hours in an 8-hour day and for 20 minutes without interruption, and that he could lift up to 5 pounds occasionally. *Id.* Dr. Saleh noted that Plaintiff had tenderness, swelling, and muscle spasms over the paraspinous, L. dorsi, and quadratus lumborum muscles, that straight leg raising was positive at 50 degrees, and that Plaintiff's MRI revealed degenerative disc disease/spondylolysis of lumbar spine. *Id.* At that time, Dr. Saleh expected Plaintiff would be "unemployable" between 30 days and 9 months. *Id.*

On January 25, 2005, Dr. Saleh noted that Plaintiff could lift up to 10 pounds occasionally, but that he could not perform any frequent lifting. *Id.* Dr. Saleh also noted that Plaintiff could stand/walk and sit each for 30-45 minutes in an 8-hour day and for 5 to 10 minutes without interruption and that Plaintiff could not perform even sedentary work on a sustained basis. *Id.*

Dr. Gollamudi noted in May 2005 that the combined effects of Plaintiff's physical and mental impairments caused a greater degree of functional limitations than his physical limitations considered alone. (Tr. 415-20). Dr. Gollamudi also noted that Plaintiff had a difficult time expressing his flaws, and that he would hold things in until he would explode, and that Plaintiff would not be prompt and regular in attendance due to his anxiety and his inability to handle stress. *Id.* Dr. Gollamudi reported that Plaintiff would tend to isolate himself if placed in a job setting, that he would have problems concentrating and staying on task, and that he would lose track of time. *Id.*

On June 6, 2005, Plaintiff consulted with Dr. Danis for complaints of numbness and tingling of his hands. (Tr. 422-23). Dr. Danis noted that Plaintiff exhibited a positive Tinel's sign on the left and that his grip strength on the left was stronger than on the right. *Id.* A subsequent

EMG of the upper extremities showed a mild bilateral carpal tunnel syndrome at the wrist and a mild right ulnar neuropathy at the elbow. (Tr. 425). Dr. Danis recommended surgery. (Tr. 421).

Plaintiff underwent a submuscular transposition of the right ulnar nerve at the elbow and a repeat right carpal tunnel release using an ulnar fat vascularized flap which Dr. Danis performed on August 23, 2005. (Tr. 543-44.) On September 26, 2005, Dr. Danis noted that Plaintiff reported an improvement although he continued to experience some tingling. (Tr. 542).

An x-ray of Plaintiff's right shoulder performed on April 18, 2006, revealed evidence of a previous injury involving the distal end of the clavicle along with degenerative changes. (Tr. 532).

Examining physician Dr. Koppenhoeffer, reported on May 15, 2006, Plaintiff had discomfort on percussion and palpation of the spinal area, range of motion of the cervical and lumbosacral spine was decreased, that Plaintiff's right shoulder showed limitation of motion secondary to discomfort but passive range of motion was full, and that there was crepitation noted involving the shoulder movement in both active and passive movements. (Tr. 469-80). Dr. Koppenhoeffer also reported that Plaintiff demonstrated decreased sensation involving his right arm in a circumferential manner distal to the elbow, that motion of the lumbar spine was decreased secondary to discomfort in all planes, and that straight leg raising was limited to 30 degrees. *Id.* Dr. Koppenhoeffer opined that Plaintiff's right shoulder was his major limitation on a physical basis, that Plaintiff would have difficulty performing repetitive lifting away from his body or overhead, that he should not lift objects weighing more than 20 pounds with his right arm, and that with respect to Plaintiff's hand, subjective complaints outweigh objective abnormalities. *Id.* Dr. Koppenhoeffer noted that the medical records suggested Plaintiff was suffering from aging changes involving the

lumbosacral spine which might restrict Plaintiff's ability to do repetitive bending/stooping activities, that Plaintiff should only balance, kneel, crouch, crawl, or stoop occasionally, and that he would be limited to occasional reaching, handling, fingering, and feeling. *Id.* Dr. Koppenhoeffer opined additionally that based on his subjective complaints, Plaintiff should be able to change his position at will for comfort purposes. *Id.*

On June 1, 2006, Dr. Saleh reported that Plaintiff was able to stand/walk for less than thirty minutes. (Tr. 535-38). Dr. Saleh also reported that Plaintiff had decreased strength and endurance, decreased deep tendon reflexes, decreased ranges of motion, decreased sensation, an abnormal gait, and a limp in the right lower extremity. *Id.* Dr. Saleh reported further that Plaintiff had a recurrence of his hand problems and that Plaintiff was unemployable for twelve months or more. *Id.*

In his Statement of Errors, Plaintiff alleges that the Commissioner erred by rejecting Drs. Nwokoro, Saleh, and Gollamudi's opinions that his limitations are inconsistent with an ability to sustain work. (Doc. 9).

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or

11

evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

The reason for the "treating physician rule" is clear: the treating physician has had a greater opportunity to examine and observe the patient. *See, Walker v. Secretary of Health and Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992). Further, as a result of his or her duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians. *Id.* (citation omitted).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

In determining that Dr. Nwokoro's opinion did not support a finding of disability, Judge Shell determined that Dr. Nwokoro's opinion did not satisfy the duration requirement of the Act. (Tr. 28-30). With respect to Dr. Saleh's opinion, Judge Shell rejected it essentially on the basis that it was not supported by the objective evidence and was inconsistent with the other evidence of record. (Tr. 28-30). This Court agrees with the Commissioner's conclusions.

First, with respect to Dr. Nwokoro's opinion, even assuming that Dr. Nwokoro's opinion with respect to Plaintiff's residual functional capacity provides a basis for concluding that Plaintiff 's residual functional capacity was inconsistent with performing work activity, Dr. Nwokoro opined that Plaintiff's limitations would last between nine and eleven months. That, of course, is inconsistent with the duration requirement of the Act. 42 U.S.C. §1382c(a)(A).

As to Dr. Saleh's opinion, this Court first notes that many, if not most, of the treatment notes from Dr. Saleh's office seemed to reflect the use of a "signature stamp" of Dr. Saleh's name. *See, e.g.,* Tr. 399, 402, 404, 406, 436, 439, 442, 444, 483, 487, 491. In addition, many of the treatment notes reflect the signature of only the physician's assistant associated with Dr. Saleh. *See,* Tr. 400, 440, 448, 451, 454, 457, 460, 492, 503. Further, it appears that many of the clinical notes bear Dr. Saleh's signature stamp and well as the physician assistant's signature stamp. *See, e.g.*, Tr. 399, 402, 406, 506.

Nevertheless, assuming the accuracy of what is written or indicated in Dr. Saleh's clinical notes and assuming that those notes were indeed documented by Dr. Saleh, they are inconsistent with Dr. Saleh's opinion that Plaintiff is totally disabled. For example, while there are indications in Dr. Saleh's clinical notes of some positive objective findings such as tenderness, muscle spasm, swelling, and decreased ranges of motion, there are also consistent indications that

13

Plaintiff's "medications are effective in controlling the pain and increasing function and quality of life". *See, e.g.,* Tr. 399, 400, 401, 403, 405; 439, 440, 483, 484, 487. Finally, Dr. Saleh's opinion is inconsistent with Dr. Danopulos' and Dr. Koppenhoeffer's opinions as well as the opinions of the reviewing physicians. *See* Tr. 353-57.

Plaintiff also argues that the Commissioner erred by rejecting Dr. Gollamudi's opinion.

Although Dr. Gollamudi essentially opined that Plaintiff is disabled by his alleged mental impairment, his opinion is inconsistent with the mental health treatment notes as well as with other evidence. For example, most of the Dr. Gollamudi's notes reflect normal clinical findings such as normal behavior, no abnormal movements, normal thought processes, no delusions, and no perceptual abnormalities. *See, e.g.,* Tr. 360-71; 524-34. In addition, the clinical notes reflect no side effects from medication, no audio or visual hallucinations, and symptom improvement. *Id.* Further, Dr. Gollamudi's conclusion that Plaintiff is disabled is inconsistent with the clinical notes from Dr. Saleh's office which consistently indicate that Plaintiff was alert and oriented and that he had a normal mood. *See, e.g.,* Tr. 399-406; 483-523.

Under these facts, the Commissioner had adequate bases for rejecting Drs. Nwokoro's, Saleh's, and Gollamudi's opinions that Plaintiff is disabled.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v.*

*Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

December 3, 2008.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).